51 A.3d 743

**Jazminn E. TAYLOR**

v.

**Ronald FISHKIND, et al.**

**No. 2407, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Aug. 31, 2012.

122

Scott E. Nevin & George Sweglein, Baltimore, MD (Law Office of Peter T. Nicholl, John Amato, IV, Goodman, Meagher & Enoch, LLP, Baltimore, MD), on the brief, for appellant.

David A. Carter & Laura C. Jenifer (Meyers, Rodbell & Rosenbaum, PA, Baltimore, MD), on the brief, for appellee.

Panel: EYLER, DEBORAH S., WRIGHT, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

WRIGHT, J.

This case arises from a complaint filed in the Circuit Court for Baltimore City by Jazminn E. Taylor, appellant, through

her mother, Nellie Virginia Taylor, in which Jazminn[1] sought damages for injuries she sustained as a result of alleged exposure to lead paint while living at 2320 Riggs Avenue and 1025 North Carrollton Avenue. The complaint identified appellees, Ronald Fishkind and Edward Lichter, as the owners of 1025 N. Carrollton Avenue, and the Housing Authority of Baltimore City ("HABC") as the owner of 2320 Riggs Avenue during the period that Jazminn lived at each residence. The complaint asserted one count of negligence, for failing to remove lead paint from the premises, and one count of unfair trade practices in violation of Md.Code (1975, 2005 Repl.Vol.) § 13–303 of the Commercial Law Article ("CL"), for leasing the premises when they contained lead paint, against each defendant.

On June 14, 2010, appellees filed a motion for summary judgment, in which they argued that the testimony of Jazminn's medical causation expert, Dr. Henri Merrick, was inadmissible pursuant to Maryland Rule 5–702 because she lacked a sufficient factual basis to testify that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue or that 1025 N. Carrollton Avenue was a lead source. Appellees further asserted that, without Dr. Merrick's testimony, Jazminn could not prove the elements of her claims, and therefore, appellees were entitled to judgment as a matter of law. On August 5, 2010, finding that there was no factual basis for Jazminn's causation expert to testify that 1025 N. Carrollton was a substantial factor in contributing to Jazminn's injuries or that it was a lead source, the circuit court granted appellees' motion for summary judgment. On December 22, 2010, Jazminn timely filed this appeal.

### Questions Presented

Jazminn presents two questions for our review, which we have consolidated and rephrased as follows:[2]

---

1. Because Jazminn and her mother share the same last name, we will refer to each by their first names.

2. Jazminn presented the issues as follows:

Did the circuit court err in granting summary judgment in favor of appellees after concluding that Dr. Merrick lacked a sufficient factual basis to determine with a reasonable degree of medical certainty whether 1025 N. Carrollton Avenue was a substantial contributing source of Jazminn's lead exposure?

## Facts

Jazminn was born on June 7, 1990. From her birth until February 1993, Jazminn lived with her family at 2320 Riggs Avenue. She then moved with her family to 1025 N. Carrollton Avenue where she resided from February 1993 until March 1994. Thereafter, she lived at 828 Clintwood Court from March 1994 until 2005. While at each residence, Jazminn's blood was tested for the presence of lead. Between April 22, 1991 and November 21, 1996, Jazminn's blood was tested ten times, the results of which were as follows:

| DATE | BLOOD LEAD LEVEL (mcg/dL)[3] |
| --- | --- |
| **2320 Riggs Avenue–6/7/1990–02/1993** | |
| 4/22/1991 | 5 |
| 10/31/1991 | 10 |
| **1025 North Carrollton Avenue–02/1993–03/1994** | |
| 4/15/1993 | 17 |
| 5/28/1993 | 13 |
| 1/27/1994 | 7 |
| **828 Clintwood Court–03/1994–2005** | |
| 8/3/1994 | 6 |
| 7/19/1995 | 6 |

1. Did the circuit court err when it granted Fishkind/Lichter's motion for summary judgment and refused to allow Dr. Merrick to testify that the N. Carrollton property was a substantial contributing source of Jazminn Taylor's injurious lead exposure?

2. Did the circuit court err when it granted summary judgment to defendants Fishkind/Lichter solely on the basis of the excluded opinion of Dr. Merrick as to causation?

**3.** Blood lead levels are measured in micrograms per deciliter, which can be expressed as mcg/dL or g/dL. We shall use the former designation.

| | |
|---|---|
| 9/20/1995 | 3 |
| 5/6/1996 | 6 |
| 11/21/1996 | 4 |

According to the causation report prepared by Jazminn's expert, "since 1991, the accepted range [for a child's blood lead level] has been (0 to 9) mcg/dl." Thus, a blood lead level of 10mcg/dL and above is considered elevated. Therefore, on three occasions, Jazminn was found to have an elevated blood lead level. Two of the tests revealing an elevated blood lead level were conducted while Jazminn lived at 1025 N. Carrollton Avenue.

On December 10, 2007, Jazminn filed her initial complaint in the Circuit Court for Baltimore City against Fishkind, Lichter, and the HABC. According to the complaint, both 1025 N. Carrollton Avenue and 2320 Riggs Avenue contained lead-based paint in such a deteriorated condition that it was peeling, chipping, and flaking. The complaint further alleged that Jazminn ingested lead-based paint chips, dust, and powder while living at both properties and that she suffered permanent brain damage as a result.

On July 3, 2008, Jazminn identified Dr. Henri Frances Merrick, M.D. as one of her expert witnesses. As to Dr. Merrick's expected testimony and the basis for that testimony, Jazminn stated:

Dr. Merrick is a pediatrician who has reviewed records and reports and is expected to render an opinion that the deficits of Jazminn Taylor are related to her exposure to lead paint at the Defendants' properties, and that she has permanent brain damage, and a loss of Intelligence Quotient points as a result of that lead exposure. Dr. Merrick's opinions are based upon her review of the medical, environmental and school records related to this case and also upon the numerous medical studies that link cognitive deficiencies and IQ loss to early childhood lead exposure. Further, Dr. Merrick relies upon her medical education, training and experience in reaching her conclusions.

On July 28, 2008, after discovering that the HABC did not own the property at 2320 Riggs Avenue while she lived there, Jazminn amended her complaint to add Allan S. Bird and Bentalou Associates, LTD., whom she identified as the owners of 2320 Riggs Avenue during the relevant period. Shortly thereafter, on August 7, 2008, Jazminn agreed to dismiss the HABC. On November 26, 2008, Jazminn amended her complaint a second time to add MYAL Partnership Management Services, Inc., Real Properties Services Corporation, and the estate of Allan S. Bird [4] as defendants. The Second Amended Complaint identified MYAL Partnership Management Services, Inc. and Real Properties Services Corporation as the parties who were responsible for the maintenance and management of 2320 Riggs Avenue while Jazminn lived there.

During discovery, Jazminn retained Arc Environmental, Inc. ("Arc") to inspect 1025 N. Carrollton Avenue for lead-based paint. Arc inspected the property on June 3, 2009, and it issued a report with its findings the following day. According to the report, the inspection involved the use of an LPA–1 X-ray fluorescence ("XRF") spectrum analyzer to test a number of exterior [5] surfaces of the house for the presence of lead as well as a visual inspection of the condition of the paint on the tested surfaces. The report further stated that, pursuant to Maryland standards, a surface is classified as "negative" if the XRF spectrum analyzer provides a reading of 0.7 mg/cm$^2$ or less, and it is classified as "positive," indicating that it contains lead-based paint, if the XRF spectrum analyzer provides a reading of 0.8mg/cm$^2$ or more. The results of the inspection were as follows:

---

4. After filing the First Amended Complaint, Jazminn discovered that Allan S. Bird was deceased, so she added his estate as a defendant in the Second Amended Complaint.

5. A notation in the report states that no one was available to grant the inspector access to the interior of the house when he arrived at 1025 N. Carrollton Avenue. Therefore, no interior surfaces were tested.

| Room | Wall[6] | Component | Paint Condition[7] | Result[8] | P, N, I[9] |
|---|---|---|---|---|---|
| Front Exterior | A | Window Header | I | 0.0 | N |
| | A | Window Apron | I | 6.5 | P |
| | A | Window Sill | I | 0.0 | N |
| | A | Wall Surface | I | 0.0 | N |
| | A | Security Bars | I | 0.0 | N |
| | A | Handrail | F | 0.0 | N |
| | A | Door Jamb | I | 0.0 | N |
| Rear Exterior | C | Wall Surface (C) | I | 0.3 | N |
| | C | Security Bars | I | 0.0 | N |
| | C | Door Threshold | P | 0.5 | N |
| | C | Wall Surface (B) | I | 0.0 | N |
| | C | Door Jamb | I | 0.0 | N |
| | C | Window Sill | I | 0.0 | N |
| | C | Wall Foundation | P | 0.5 | N |

6. The Arc report used a lettering system to identify each wall tested. According to that system, "A" corresponds to the closest wall parallel to the front door of the property. B, C, and D were assigned in a clockwise fashion.

7. The report contained three categories to describe the condition of the paint: intact, fair, and poor. The report abbreviated these categories as I, F, and P. It further described each category as follows:
 Intact: Paint film appears to have no surface deterioration and does not chalk, flake, or peel; no signs of cracking or blistering; no separation from the substrate.
 Fair: The paint film is largely intact, but is cracked, worn, or chipping. Approximately 10% or less of the surface is deteriorated or defective.
 Poor: More than 10% of the surface is peeling, chalking, flaking, blistering, or otherwise separated from the substrate. "Poor" paint conditions should be addressed as a top priority because the likelihood of these components generating leaded dust.

8. The result indicates the lead content of the tested surface expressed in milligrams per square centimeter ($mg/cm^2$).

9. The Arc report used P, N, and I as abbreviations for positive, negative, and inconclusive. As stated above, a positive test indicates that the tested surface contains 0.8 milligrams of lead per square centimeter or more and a negative test indicates that the tested surface contains 0.7 milligrams of lead per square centimeter or less.

Thus, the only surface that tested positive for the presence of lead-based paint was an exterior window apron on the front of the house, and the paint on the window apron was intact. All other tested surfaces were negative for the presence of lead-based paint.

On July 10, 2009, Nellie, Jazminn's mother, was deposed. During her deposition, the following ensued:

[Defense Counsel]: When Jazminn was younger, did you ever notice her putting paint chips or dust into her mouth?

[Nellie]: I used to see the stuff on her hands. But at the time, I didn't know what it was, when I lived on Carrollton Avenue.

[Defense Counsel]: And what did you do when you saw it on her hands?

[Nellie]: I would wipe it off and ask her where did she get it from or try to find out where she get it from. I seen she had paint chips in her mouth maybe a couple of times.

[Defense Counsel]: What did you do when you saw the paint chips in her mouth?

[Nellie]: Took them out, washed her hands and mouth off.

Following her deposition, Nellie submitted an affidavit, in which she testified that she observed chipping and flaking paint at 1025 N. Carrollton Avenue, and that she saw Jazminn with paint chips and dust on her hands and in her mouth while they lived there. Specifically, Nellie stated:

The property at 1025 N. Carrollton Avenue was an old home with original wood surfaces that were painted. There was flaking and chipping paint along the windows and window-sills, on the banister and along the woodwork around some of the doors during the entire time that we resided there, including when we first moved in.

I observed Jazminn, while living and playing at the 1025 N. Carrollton Avenue property, with paint chips or dust on her hands and also in her mouth on a number of occasions.

In September 2009, Dr. Merrick authored a causation report in which she stated her opinion and the basis for her

opinion regarding Jazminn's exposure to lead-based paint at 2320 Riggs Avenue and 1025 N. Carrollton Avenue. Specifically, Dr. Merrick stated:

It is my opinion that Jazminn Taylor was exposed to lead at the 1025 N. Carrollton Avenue dwelling and at the 2320 Riggs Avenue dwelling. The bases for my opinion are: the age of the dwellings, the described conditions of the first dwelling, the detection of lead in an exterior window apron of this first dwelling and Jazminn's blood lead levels while living at each dwelling.

Dr. Merrick further supported her opinion as follows:

These first two dwellings are in an area of Baltimore known to contain lead paint and they are of the age to most probably contain lead based paint. Property records for the 2320 Riggs Avenue [property] show that it dates back as far as 1968 and the property records for the house at 1025 N. Carrollton Avenue show that it was built prior to 1909. Both houses were built before 1978 and like 75% of homes built prior to 1978 and most houses built before 1950 these two most probably contained lead based paint. In the plaintiff's answer to interrogatories and in the mother's deposition the 1025 N. Carrollton dwelling was described as having chipping, flaking and peeling paint. In her deposition, the mother reported seeing paint chips [on] Jazminn's hands and in her mouth at the North Carrollton residence. Of note, "no chipping, flaking or peeling paint was described at any of the properties she was visiting at the time." Testing of the exterior of 1025 N. Carrollton Avenue was positive for lead in a front exterior window apron. The lead content of the paint was 6.5 mg/cm², normal is less than or equal to 0.7 mg/cm² of lead. This paint was found to be intact. Testing of the interior of the house is not available. Finding lead on the exterior of this old house adds probability that its interior also contained lead based paint.

On December 1, 2009, Dr. Merrick was deposed. Her testimony pertained to the basis for her opinion that Jazminn

was exposed to lead-based paint at 1025 N. Carrollton Avenue. During Dr. Merrick's deposition, the following ensued:

[Defense Counsel]: Okay. And there is no blood lead data available between 10–31–91 and April 15, '93, correct?

[Dr. Merrick]: Not that I could find.

[Defense Counsel]: So that's a period of about a year and a half with no blood lead testing?

[Dr. Merrick]: Correct.

[Defense Counsel]: Okay. And you don't know what Jazminn's blood lead level was when she moved in on February 10, '93; do you?

[Dr. Merrick]: I don't—no one knows what it was.

[Defense Counsel]: Okay. And you don't know what Jazminn's blood lead level was for that 18 month period between October 31, '91 and April 15, '93; do you?

[Dr. Merrick]: No, I don't.

[Defense Counsel]: Okay. You would agree with me wouldn't you that it would be guessing in order to state what Jazminn's blood lead level was at any point between 10–31–91 and April 15, '93?

[Dr. Merrick]: I wouldn't even be able to guess.

\* \* \*

[Defense Counsel]: And you would agree, wouldn't you, that the decline from a 17 to a 13 between April and May of '93 is an indication that there was no ongoing exposure correct?

[Plaintiff's counsel]: Objection.

[Dr. Merrick]: It would seem there's not but I can't attest to it for sure. The trend is, it looks like it's not.

[Defense Counsel]: Okay. So it's more likely than not there was no exposure going on between April and May of '93, correct?

[Plaintiff's Counsel]: Objection.

[Dr. Merrick]: A month, a month, a month. Let's see. It's really more like six weeks. There was—it could be—the 13 and the 17 could be the same. I mean she could have had an acute exposure at the 17 or three or four days before or

a week before and no more acute ingestions after that. That's a possibility.

[Defense Counsel]: You just don't know though; do you?

[Dr. Merrick]: I don't know. I don't think anyone knows.

[Defense Counsel]: There's just not enough information?

[Dr. Merrick]: There's not enough information.

* * *

[Defense Counsel]: Okay. And once again you don't know what Jazminn's blood lead reading was on February 10, '93 when she moved [ ] to 1025 North Carrollton, correct?

[Dr. Merrick]: Correct.

[Defense Counsel]: Okay. So you don't know that Jazminn's blood lead actually went up during the time that she lived at 1025 North Carrollton, correct?

[Dr. Merrick]: The only thing I know is that she was living there when it was found to be up. That's the only thing.

[Defense Counsel]: When it was found to be a 17?

[Dr. Merrick]: Correct.

[Defense Counsel]: Okay. Now, when a child is exposed to lead, and then their exposure stops, the lead does not just automatically leave the body and leave them with a blood lead of zero the minute the exposure stops, correct?

[Dr. Merrick]: Correct.

[Defense Counsel]: Lead has a very long half-life in the human body, correct?

[Dr. Merrick]: Different chambers, yes.

[Defense Counsel]: Yeah. And it's about 30 days in blood?

[Dr. Merrick]: Yes.

[Defense Counsel]: But it's years and years and years—

[Dr. Merrick]: In the bone and teeth.

[Defense Counsel]:—in the rest of the body?

[Dr. Merrick]: Yes.

[Defense Counsel]: And the lead leaches out of the bones and the teeth and goes into the blood and equilibrates over time, correct?

[Dr. Merrick]: Correct.

[Defense Counsel]: Which is why you don't see the blood lead level go down to zero the minute the exposure stops, correct?

[Dr. Merrick]: Correct.

[Defense Counsel]: So based on the fact that Jazminn had a blood lead 17 on April 15, '93, that is not proof that Jazminn was actually being exposed to lead at 1025 North Carrollton, correct?

[Dr. Merrick]: That is not proof, no.

[Defense Counsel]: Okay. That could entirely be lead that was already in her body from some other source prior to the time that she moved in, correct?

[Dr. Merrick]: That's correct, but you're missing the other side, it could not be also. There's no information—

[Defense Counsel]: You just don't know. You just don't know?

[Dr. Merrick]: I don't know.

On June 14, 2010, the Riggs Avenue defendants filed a motion for summary judgment. On August 11, 2010, the circuit court ruled on their motion, granting it in part and denying it in part, finding that there was sufficient circumstantial evidence for a jury to conclude that Jazminn was exposed to lead paint at 2320 Riggs Avenue. On August 26, 2010, the Riggs Avenue defendants reached a settlement agreement with Jazminn, and on November 30, 2010, Jazminn filed a stipulation of dismissal removing the Riggs Avenue defendants from the suit.

Appellees also filed a motion for summary judgment on June 14, 2010. In it, they argued that Dr. Merrick's testimony was inadmissible because she lacked a sufficient factual basis to support her opinion that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue. Specifically, they asserted that Dr. Merrick conceded that she did not know Jazminn's blood lead level when Jazminn moved to 1025 N. Carrollton Avenue, that Jazminn's elevated blood lead level

while living at 1025 N. Carrollton Avenue was not proof of exposure at 1025 N. Carrollton Avenue but could have been the result of lead that was already in her system from a prior exposure, and that Jazminn's decreasing blood lead levels while living at 1025 N. Carrollton Avenue were not indicative of ongoing exposure. Appellees further averred that Dr. Merrick lacked a sufficient factual basis to testify that 1025 N. Carrollton Avenue was a lead source because the only evidence that Dr. Merrick relied on to conclude that 1025 N. Carrollton Avenue contained lead-based paint was the presence of lead-based paint on a window apron on the exterior of the house and the age of the house. According to the appellees, the presence of lead-based paint on the exterior of the house is not proof that the interior of the house also contains lead-based paint. Additionally, appellees cited in *Dow v. L & R Properties, Inc.,* 144 Md.App. 67, 74, 796 A.2d 139 (2002), for the proposition that a particular house is not presumed to contain lead-based paint solely because of the age of the structure.

Regarding Jazminn's claim for unfair trade practices in violation of the Consumer Protection Act, CL §§ 13–101 to 13–501, appellees argue that, without Dr. Merrick's testimony that 1025 N. Carrollton Avenue contained lead-based paint when Jazminn lived there, the only evidence of the condition of 1025 N. Carrollton Avenue at the inception of the tenancy was the rental agreement in which Jazminn's mother certified that she had inspected the premises and found them to be "safe, sanitary, and suitable for habitation." Appellees further asserted that Jazminn lacked standing to bring a claim under the Consumer Protection Act because she was not a party to the lease, and therefore, she was not a consumer according to the terms of the statute.

Jazminn responded that summary judgment was inappropriate because there was sufficient circumstantial evidence to show 1025 N. Carrollton Avenue contained lead-based paint such that a trier of fact could reasonably conclude Jazminn was exposed to lead-based paint while living there. Jazminn argued that 1025 N. Carrollton Avenue was built prior to 1918

and a number of government studies have found that most houses built at that time contain lead-based paint. Specifically, Jazminn cited a report issued by the Environmental Protection Agency ("EPA") in 1986, in which the EPA determined that 99% of houses built before 1940 contained lead-based paint. Jazminn further relied on a survey conducted by the Department of Housing and Urban Development ("HUD"), between 1989 and 1990, which indicated that, of the 77 million privately owned homes built before 1980, 57 million homes contained lead-based paint. Jazminn also cited a report issued by the Center for Disease Control ("CDC") in 1997, in which it declared that 83% of all homes built before 1978 still contained some lead-based paint. Thus, Jazminn asserted that the age of the house, the discovery of lead-based paint on the exterior of the house, and testimony from Jazminn's mother that the house had chipping and peeling paint established a sufficient factual basis for a trier of fact to infer that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue.

Regarding her claim under the Consumer Protection Act, Jazminn argued that summary judgment was inappropriate because there was a material factual dispute as to the condition of 1025 N. Carrollton Avenue when Jazminn moved there. Jazminn further asserted that she could sue under the Consumer Protection Act as a third-party beneficiary and, even if she could not, she satisfied the statute's definition of a "consumer," and therefore, she had standing to sue under the terms of the statute.

In their reply, appellees argued that Nellie's testimony regarding her observation of chipping and peeling paint at 1025 N. Carrollton Avenue does not establish that Jazminn was exposed to lead-based paint at that property. Appellees further asserted that there was no factual basis for Dr. Merrick to testify that any interior surface contained lead-based paint when Jazminn lived at 1025 N. Carrollton Avenue. Additionally, they reiterated that the presence of lead on the exterior of the house does not prove that the interior of the house contained lead-based paint, that the age of the house does not establish a presumption that it contained lead-based

paint, and that Jazminn's blood lead levels while living at 1025 N. Carrollton Avenue do not prove ongoing consumption of lead.

On August 4, 2010, the circuit court held a hearing on appellees' motion for summary judgment. At the end of the hearing, the circuit court granted the motion stating as follows:

> The evidence in this case does not come close to the kind of circumstantial evidence that the Court found sufficient in *Dow* and that this Court has seen in other cases where it's clearly, you know, enough and it's not simply the age of the house and even the peeling.

> \* \* \*

> So the motion as to 1025 North Carrollton Avenue, I am going to grant it for the reasons stated in the Motion and the reasons argued here by Defense and, basically, for [sic] based upon Dr. Merrick's testimony.

On August 5, 2010, the circuit court issued a written order granting appellees' motion for summary judgment and stating:

> Upon consideration of the Defendants' Ronald Fishkind and Edward Lichter's Motion for Summary Judgment ..., it is this 5th day of August, 2010 by the Circuit Court for Baltimore City, hereby ORDERED that the Motion for Summary Judgment is GRANTED because Plaintiff relies exclusively on the opinions of Dr. Merrick and ... there is no factual basis for Dr. Merrick to say with a reasonable degree of medical certainty that 1025 N. Carrollton was a substantial factor in contributing to Plaintiff's injury, nor is there a basis to say that 1025 N. Carrollton was a lead source.

(Footnote omitted).

### Standard of Review

The circuit court's decision to grant summary judgment in favor of appellees was predicated on its determination that Dr. Merrick's expert testimony was inadmissible because she lacked a sufficient factual basis to conclude that Jazminn was

exposed to lead-based paint at 1025 N. Carrollton Avenue. Thus, we must first review the circuit court's decision to exclude Dr. Merrick's testimony before we consider whether the circuit court correctly granted summary judgment in favor of appellees.

█ The Court of Appeals has frequently stated that "the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203, 900 A.2d 227 (2006) (citing *Clemons v. State*, 392 Md. 339, 359, 896 A.2d 1059 (2006); *Wilson v. State*, 370 Md. 191, 200, 803 A.2d 1034 (2002); *Hartless v. State*, 327 Md. 558, 576, 611 A.2d 581 (1992); *Johnson v. State*, 303 Md. 487, 515, 495 A.2d 1 (1985); *Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903 (1984)). Therefore, "[w]e review these types of evidentiary rulings pursuant to the abuse of discretion standard, reversing only when the court 'exercise[d] discretion in an arbitrary or capricious manner or . . . act[ed] beyond the letter or reason of the law.'" *King v. State*, 407 Md. 682, 696, 967 A.2d 790 (2009) (quoting *Kelly v. State*, 392 Md. 511, 530–31, 898 A.2d 419 (2006)) (alterations in original). Accordingly, we must affirm the circuit court's ruling excluding Dr. Merrick's testimony unless we conclude that the circuit court acted arbitrarily or capriciously in ruling that Dr. Merrick lacked a sufficient factual basis to support her testimony or that "no reasonable person would share the view taken by the [circuit court]." *Brown v. Daniel Realty Co.*, 409 Md. 565, 601, 976 A.2d 300 (2009) (citation omitted).

"Whether summary judgment was granted properly is a question of law." *Livesay v. Baltimore County*, 384 Md. 1, 9, 862 A.2d 33 (2004). Therefore, we will review the circuit court's ruling on appellees' motion for summary judgment *de novo*. *Id.* Summary judgment is appropriate where "there is no genuine dispute as to any material fact and . . . the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f). Thus, on appeal, we

conduct an independent review of the record "to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Wells Fargo Home Mortgage, Inc. v. Neal,* 398 Md. 705, 714, 922 A.2d 538 (2007) (citation omitted). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520 (2006) (citation omitted).

## Discussion

### I. Contentions

■ On appeal, Jazminn argues that the circuit court erred when it excluded Dr. Merrick's testimony on the grounds that she lacked a sufficient factual basis to support her opinion that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue and granted summary judgment in favor of the appellees after concluding that Jazminn could not prove causation without Dr. Merrick's testimony. Specifically, Jazminn asserts that, to defeat a motion for summary judgment, she need not present direct evidence that she was exposed to lead-based paint at 1025 N. Carrollton Avenue; rather, she contends that circumstantial evidence of exposure is sufficient if it amounts to a probability of exposure at the subject property instead of a mere possibility. Jazminn further avers that Dr. Merrick's opinion as to causation was supported by sufficient circumstantial evidence, including the age of the property,[10]

---

10. On appeal, Jazminn supports her position that houses constructed when 1025 N. Carrollton Avenue was built are likely to contain lead-based paint by reference to the same studies she relied on before the circuit court. In a footnote, Jazminn avers that this Court has relied on medical journals, scientific journals, reports to Congress, and other government reports and publications to take judicial notice of additional facts necessary to place a complaint in context. In their response, appellees argue that the studies Jazminn cites are not appropriate for judicial notice under Md. Rule 5–201 because they speak to a probability rather than facts that are capable of accurate determination by reliable sources. In her reply, Jazminn clarifies that she is not asking

the presence of flaking and chipping paint, the lack of any evidence that the property had been gut rehabilitated, Nellie's testimony that she had observed Jazminn with paint chips on her hands and in her mouth, a lack of evidence of exposure to lead at any other address while Jazminn lived at 1025 N. Carrollton Avenue, a positive test for the presence of lead-based paint on the exterior of the house, and Jazminn's recorded blood lead level of 17 mcg/dL over two months after moving to 1025 N. Carrollton Avenue. Jazminn further argues that her elevated blood lead level at 1025 N. Carrollton Avenue indicates exposure to lead at that property because lead in blood has a half-life of between 18 days and a month.

Jazminn asserts that, to establish causation in a lead-paint case, the plaintiff must prove by a preponderance of the evidence "that the injured child was exposed to lead-based paint while occupying the leased residential premises, and that the exposure was to sufficient quantities of lead so as to bring about the injury suffered." She contends that the above evidence is sufficient circumstantial evidence that her injuries were caused by exposure to lead-based paint at 1025 N. Carrollton Avenue because it exceeds the level of evidence that we held was sufficient to defeat a motion for summary judgment in *Dow.* Jazminn notes that in *Dow,* 144 Md.App. at 75–76, 796 A.2d 139, we held that the plaintiff had put forth sufficient circumstantial evidence of exposure to lead-based paint at the subject property to defeat a motion for summary judgment where the plaintiff presented evidence that the dwelling was built prior to 1950, that such dwellings often contain lead-based paint, that the plaintiff ate paint chips in the dwelling, and that the plaintiff was diagnosed with lead poisoning. Jazminn further claims that in reaching this con-

---

this Court to take judicial notice of the studies she cited in her brief; rather, she contends that Dr. Merrick could rely on these studies in forming her opinion under Md. Rule 5–703(a). We agree that "[a]n expert may ... extrapolate from data and facts contained in others' reports and studies in order to form his [or her] expert opinion." *Keene Corp., Inc. v. Hall,* 96 Md.App. 644, 660, 626 A.2d 997 (1993). As Jazminn does not contend that we are required to take judicial notice of these studies, we need not address appellees' argument on this point.

clusion, we did not require lead assessment reports or documented blood lead levels, both of which Jazminn has provided in this case.

Jazminn also cites the decision of the Commonwealth Court of Pennsylvania in *Ford v. Philadelphia Housing Authority*, 848 A.2d 1038 (Pa.Cmwlth.2004), in support of her position that Dr. Merrick's testimony as to causation should have been admitted. Jazminn contends that in *Ford*, the court concluded that the trial court did not err in relying on the testimony of plaintiff's causation expert because it was supported by a sufficient factual basis. Thus, Jazminn argues that the circuit court should have admitted Dr. Merrick's testimony because "Dr. Merrick's opinions in the case at bar, and the factual bases supporting those causative opinions, are almost a carbon copy of [the expert's opinions] that were upheld in the *Ford* case."

Additionally, Jazminn contends that the circuit court erred when it excluded Dr. Merrick's testimony because the court based its decision on its own credibility determinations. *See Davis v. Goodman*, 117 Md.App. 378, 700 A.2d 798 (1997) (concluding that the circuit court erred where it determined that the plaintiff's causation expert was not credible and reached its own conclusion on the issue of causation). Specifically, Jazminn asserts that the circuit court "substituted its judgment on causation for Dr. Merrick's, and ... purported to make its own findings on the doctor's credibility by discounting her reliance on the mother's direct observation of paint chips in Jazminn's hands and mouth at the N. Carrollton property." Jazminn further avers that the circuit court lacked any basis to conclude that Nellie's testimony regarding her observation of Jazminn consuming paint chips was not property specific.

Appellees respond that the circuit court properly excluded Dr. Merrick's testimony because the circumstantial evidence that Jazminn presented was insufficient to demonstrate a probability, rather than just a possibility, that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue.

Specifically, appellees assert that Dr. Merrick was unable to testify that Jazminn's blood lead level increased while living at 1025 N. Carrollton Avenue, in part because, as Dr. Merrick conceded, she did not know Jazminn's blood lead level when Jazminn began living at 1025 N. Carrollton Avenue. Appellees also contend that Jazminn's blood lead levels declined while she lived at 1025 N. Carrollton Avenue, and that Dr. Merrick testified that this decrease in Jazminn's blood lead levels indicated a lack of exposure to lead between April 1993 and January 1994. Appellees aver that Dr. Merrick admitted that Jazminn's blood lead level of 17 mcg/dL, two months after moving to 1025 N. Carrollton Avenue, is not proof that Jazminn was exposed to lead at that property.

Moreover, appellees argue that Dr. Merrick lacked evidence to support her opinion that the interior of 1025 N. Carrollton Avenue contained lead-based paint, and that Dr. Merrick was unqualified to make such a determination. In particular, appellees allege that Dr. Merrick did not have any information regarding the maintenance history of 1025 N. Carrollton Avenue, and Dr. Merrick admitted that she did not have any information regarding whether the property contained lead-based paint when Jazminn lived there or if any lead-based paint that may have existed inside the property had been removed prior to Jazminn living there. Appellees further contend that because Dr. Merrick testified that she is not certified in lead paint inspection and is not certified as a lead paint risk assessor, she is not qualified to render an opinion about the source of a person's lead exposure.

Appellees argue that because Jazminn cited no evidence as to causation beyond Dr. Merrick's inadmissible testimony, Jazminn could not carry her burden of proof on that element of her claims, and therefore, the circuit court correctly granted summary judgment in favor of appellees.

## II. Merits

### A. Admissibility of Expert Testimony

A thorough review of the record leads us to conclude that the circuit court did not abuse its discretion when it

excluded Dr. Merrick's testimony. Dr. Merrick's opinion that 1025 N. Carrollton Avenue contained lead-based paint is only supported by the age of the house and the presence of lead on one component of the exterior of the house. Moreover, the only evidence that Jazminn was exposed to lead at 1025 N. Carrollton Avenue was her elevated blood lead level while living at that property. However, by Dr. Merrick's own admission, she could not conclude that Jazminn's blood lead level rose while living at 1025 N. Carrollton Avenue nor could she rule out the possibility that Jazminn's elevated blood lead level was caused by an exposure to lead that occurred prior to her moving to 1025 N. Carrollton Avenue. In light of Dr. Merrick's inability to rule out other sources of lead, such as 2320 Riggs Avenue, and the scant evidence presented that areas of 1025 N. Carrollton Avenue that were accessible to Jazminn contained lead-based paint, we hold that the circuit court acted reasonably in concluding that the circumstantial evidence supporting Dr. Merrick's opinion amounted to no more than a possibility that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue.

■ Maryland Rule 5–702 governs the admissibility of expert testimony and provides as follows:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

In *Giant Food, Inc. v. Booker*, 152 Md.App. 166, 182–83, 831 A.2d 481 (2003), this Court stated that "[a]n expert's opinion testimony must be based on [an] adequate factual basis so that it does not amount to conjecture, speculation, or incompetent evidence." (Citation omitted). In *Terumo Med. Corp. v.*

*Greenway,* 171 Md.App. 617, 624, 911 A.2d 888 (2006), we reiterated this proposition stating that "[t]estimony amounting only to speculation or conjecture, or testimony based on improper or insufficient data, or testimony lacking factual support in the admitted evidence, is inadmissible." (Citation omitted). A factual basis "may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions." *Sippio v. State,* 350 Md. 633, 653, 714 A.2d 864 (1998) (citation omitted).

First, Jazminn relies on the age of the house to support Dr. Merrick's conclusion that the house contains lead-based paint. Jazminn cites a number of government reports that have found that older houses, particularly those built before 1940, contain lead-based paint.[11] As 1025 N. Carrollton Avenue was built prior to 1913, Jazminn contends that it too likely contains lead-based paint. However, the age of the house is not enough, by itself, to support Dr. Merrick's conclusions. As this Court stated in *Dow,* 144 Md.App. at 74, 796 A.2d 139, "[n]either the Court of Appeals nor this Court has ever interpreted the statutes regarding lead-based paint to create . . . a presumption [that old houses contain lead-based paint.]" Moreover, in *Davis,* 117 Md.App. at 393, 700 A.2d 798, we commented that "the mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency."

Second, Jazminn relies on the absence of any evidence that 1025 N. Carrollton Avenue has been gut rehabilitated to further support Dr. Merrick's conclusion that the property contains lead-based paint. However, the absence of any evi-

---

11. Jazminn cites the same studies that she relied on before the circuit court, including a 1986 EPA study which determined that 99% of houses built before 1940 contain lead-based paint, a 1990 HUD survey which indicated that 57 million of the 77 million privately owned homes in the United States built before 1980 contained lead-based paint, and a 1997 CDC report which concluded that 83% of all homes built before 1978 still contain some lead-based paint.

dence that 1025 N. Carrollton Avenue has been gut rehabilitated is only significant if we accept Dr. Merrick's prior assumption that 1025 N. Carrollton Avenue contains lead-based paint because it was built at a time when many houses contained lead-based paint. If the property contained lead-based paint when it was originally constructed, then lack of evidence of a gut rehabilitation prior to Jazminn living there would support the conclusion that the property still contained lead-based paint when Jazminn lived there. However, the absence of any evidence of a gut rehabilitation does not prove that 1025 N. Carrollton Avenue ever contained lead-based paint.

Next, Jazminn argues that her mother's testimony that 1025 N. Carrollton Avenue contained chipping and flaking paint, and that she observed Jazminn consuming paint chips at the property, supports Dr. Merrick's conclusion that Jazminn was exposed to lead at 1025 N. Carrollton Avenue. However, the presence of chipping and flaking paint only increases the likelihood that Jazminn was exposed to lead-based paint if the damaged paint contained lead, and here, Jazminn did not present any evidence that the interior of the house contained lead-based paint. In fact, Jazminn did not have the interior of the house tested for the presence of lead-based paint. Instead, Jazminn only tested the exterior of the house. Although a window apron on the exterior of the house contained lead-based paint, the paint on the window apron was intact, and there is no evidence that Jazminn ever came in contact with the window apron such that it could have been the source of her lead exposure. Moreover, the circuit court could reasonably conclude that the presence of lead-based paint on the exterior of the house is not sufficient evidence that the interior of the house, to which Jazminn had access, also contained lead-based paint. Thus, the positive test of the window apron and Nellie's testimony that she observed chipping and flaking paint are not sufficient to support Dr. Merrick's conclusion that Jazminn was exposed to lead at 1025 N. Carrollton Avenue.

Finally, Jazminn contends that Dr. Merrick's conclusion that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue is supported by Jazminn's elevated blood lead level while living at the property and by the fact that Jazminn's blood lead level rose while she lived there; however, this assertion is contradicted by Dr. Merrick's own testimony. In her deposition, Dr. Merrick admitted that she does not know what Jazminn's blood lead level was when Jazminn moved to 1025 N. Carrollton Avenue due to the absence of testing shortly before or shortly after Jazminn moved. Thus, Dr. Merrick was unable to testify that Jazminn's blood lead level rose while she lived at 1025 N. Carrollton Avenue, and she instead testified that the most she could determine was that Jazminn's blood lead level was found to be elevated while she lived at 1025 N. Carrollton Avenue. Dr. Merrick further testified that lead has a half-life of about 30 days in blood but that lead's half-life in bones and teeth is years and years. Dr. Merrick also stated that lead in the bones and teeth can leach out into the blood. Therefore, as Dr. Merrick conceded, Jazminn's blood lead level of 17 mcg/dL, two months after moving to 1025 N. Carrollton Avenue, is not proof that Jazminn was exposed to lead at 1025 N. Carrollton Avenue.

Despite the shortcomings in Jazminn's evidence, she contends that, in *Dow,* we held on less evidence that the plaintiff had presented sufficient circumstantial evidence of exposure to lead-based paint at the subject property. There, the plaintiff, by and through her mother, claimed that she was exposed to lead-based paint at the subject property but did not present any evidence that the paint at the property contained lead-based paint and did not present evidence of her blood lead levels while living at the property. *Dow,* 144 Md.App. at 71, 796 A.2d 139. The circuit court granted summary judgment in favor of the defendant but, on appeal, this Court reversed holding that "[i]f believed, the evidence offered by [plaintiffs] in opposition to the motion for summary judgment could establish that the chipping and peeling paint inside [the subject property] was *the only possible source* of [plaintiff's] lead poisoning." *Id.* at 76, 796 A.2d 139. (Emphasis added). In

reaching this conclusion, we relied on documentation from the Baltimore City Department of Public Works that the subject property was in existence as early as 1935, documentation from the Baltimore City Health Department that the plaintiff had been diagnosed with lead poisoning, the testimony of plaintiff's mother that she had lived at the subject property with her daughter from the time plaintiff was two months old until after she was diagnosed with lead poisoning, and the affidavit of plaintiff's mother which stated that plaintiff spent virtually all of her time before being diagnosed with lead poisoning at the subject property and could not have been exposed to lead anyplace else. *Id.* at 75, 796 A.2d 139.

Because Jazminn claims that she was exposed to lead-based paint at two properties, a similar evidentiary showing is insufficient to prove that 1025 N. Carrollton Avenue was *the only possible source* of Jazminn's elevated blood lead level. Here, the evidence is inconclusive as to the source of Jazminn's lead exposure. It is entirely possible from the evidence presented that Jazminn was exposed to lead-based paint at 2320 Riggs Avenue and not at 1025 N. Carrollton Avenue. The affidavit provided by Jazminn's mother, if believed, eliminates other residences where Jazminn stayed as possible lead sources, but it does not eliminate 2320 Riggs Avenue as a possible lead source. Furthermore, Dr. Merrick conceded in her deposition that Jazminn's elevated blood lead level at 1025 N. Carrollton Avenue could have been the result of lead that was already in her body from a source prior to when she moved to 1025 N. Carrollton Avenue. Therefore, more is required to support Dr. Merrick's opinion that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue because, unlike in *Dow,* Jazminn could not rule out all other sources for her lead exposure.

Jazminn contends that the proof offered in this case is virtually identical to that offered in *Ford,* 848 A.2d at 1051–52, where the Commonwealth Court of Pennsylvania held that there was sufficient evidence for the trial court to conclude that the subject property contained lead-based paint and the plaintiff was exposed to lead-based paint while living there.

We disagree. Both the proof offered and the facts of the case are materially different in *Ford.* First, like in *Dow,* the plaintiff in *Ford* only alleges exposure to lead-based paint at one residence. *Id.* at 1042. Second, the plaintiff had documented blood lead levels ranging from a low of 9 mcg/dL, on December 18, 1992, to a high of 55 mcg/dL, on September 22, 1994, while residing at the subject property. *Id.* at 1044. Third, the interior of the subject property was tested for lead-based paint and positive readings were found in multiple rooms in the property. *Id.* Here, Jazminn failed to rule out 2320 Riggs Avenue as a potential lead source, she did not have documented blood lead levels that rose while she lived at 1025 N. Carrollton Avenue, and the interior of 1025 N. Carrollton Avenue was not tested for the presence of lead-based paint. Because of the substantial factual differences between the decision of the Commonwealth Court of Pennsylvania in *Ford* and this case, we conclude that the Court's decision in *Ford* is of no persuasive value in deciding Jazminn's appeal.

In light of the facts before the circuit court, we cannot conclude that it abused its discretion when it ruled that Dr. Merrick's testimony was inadmissible because she lacked an adequate factual basis to support her conclusion that Jazminn was exposed to lead-based paint at 1025 N. Carrollton Avenue. Dr. Merrick testified at her deposition that she did not know if Jazminn's blood lead level rose while she lived at 1025 N. Carrollton Avenue, and that it was possible that Jazminn's elevated blood lead level, when she moved to 1025 N. Carrollton Avenue, was the result of a prior exposure. In fact, Jazminn's complaint alleges that she had a prior exposure to lead-based paint at 2320 Riggs Avenue. Additionally, Jazminn's only evidence that 1025 N. Carrollton Avenue contained lead-based paint was the age of the house and the presence of lead on one component of the exterior of the house. We conclude that, on the basis of Dr. Merrick's testimony and the facts before the circuit court, a reasonable person could find that Jazminn's injuries could have been caused by exposure to lead-based paint at 2320 Riggs Avenue rather than at 1025 N. Carrollton Avenue. Therefore, the

circuit court did not abuse its discretion in excluding Dr. Merrick's testimony.

## B. Summary Judgment

 Having concluded that the circuit court did not abuse its discretion in ruling that Dr. Merrick's testimony was inadmissible, we turn to consider whether the circuit court erred in granting summary judgment as a result. As stated above, summary judgment is available when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501(f). Here, the material facts are not in dispute, so we must determine whether the court's ruling was legally correct. In *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76, 642 A.2d 180 (1994), the Court of Appeals reiterated that to state a claim for negligence a party must show "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty." To establish the last element, causation, a plaintiff must show that the defendant's conduct was a "substantial factor" in bringing about the alleged injury. *See Johnson v. Rowhouses, Inc.*, 120 Md.App. 579, 593, 707 A.2d 933 (1998) (affirming the circuit court's grant of summary judgment in favor of the defendant because the plaintiff's expert did not express an opinion as to whether exposure to lead on the defendant's property was a substantial cause of plaintiff's injuries); *Bartholomee v. Casey*, 103 Md. App. 34, 56–57, 651 A.2d 908 (1994) ("Absent proof that a defendant's conduct was a substantial factor in causing the injuries, a defendant is entitled to judgment.") (Citation omitted). Here, Jazminn relied exclusively on Dr. Merrick's testimony to establish that exposure to lead-based paint at 1025 N. Carrollton Avenue caused Jazminn's injuries; therefore, without Dr. Merrick's testimony, Jazminn was unable to state a claim for negligence and the appellees were entitled to judgment as a matter of law.

Jazminn challenges the circuit court's grant of summary judgment in favor of the appellees on the grounds that the circuit court made its own findings as to Dr. Merrick's credibility and substituted its own judgment on causation for that of Dr. Merrick. Specifically, Jazminn argues that the circuit court erred when it discounted Dr. Merrick's opinion on causation because Dr. Merrick relied on the mother's direct observation of paint chips on Jazminn's hands and in her mouth, which, according to Jazminn, the circuit court viewed as unreliable. In *Davis, supra,* 117 Md.App. 378, 700 A.2d 798 (1997), this Court reversed a grant of summary judgment in favor of the defendant because the circuit court ruled on the basis that it found that the plaintiff's expert witness was not credible. There, in granting summary judgment, the circuit court stated:

I've held consistently, and I'm going to hold again in this case, that the doctor's testimony, simply saying that because the house has lead paint in it, is sufficient to cause exposure. It's not true. I've listened to the testimony to at least one of these two experts and he's never said that. There has to be a condition present sufficient to, not only expose the child, but there must be activity on the part of the child to actually cause this.

*Id.* at 391–92, 700 A.2d 798. After concluding that the motions judge did not believe the expert's testimony that a child's blood lead levels could become elevated simply because the child was in the immediate vicinity of chipping or flaking paint on the exterior of the house, we reversed the circuit court's grant of summary judgment in favor of the defendant stating that "no principle is more firmly ingrained in summary judgment jurisprudence than that a motions judge should not decide issues of credibility." *Id.* at 395, 700 A.2d 798. We further stated that "a judge, in deciding a summary judgment motion, is not empowered to take judicial notice of the answers to complicated medical issues such as the issue of causation." *Id.* at 395–96, 700 A.2d 798.

Here, we lack a similar basis to conclude that the circuit court granted summary judgment in favor of the appellees

150

because it found that Dr. Merrick's testimony was not credible. Jazminn directs our attention to a statement by the circuit court at the summary judgment hearing where the court stated in reference to the testimony of Jazminn's mother:

> Yeah, actually, I'm reading her answer and I don't see what you see. I'm looking, I'm reading it. The fact that the mother said that she actually saw chips of paint on Jazminn's hands as well as some in her mouth which she removed so that she had it available to her doesn't tell me at all which house she's talking about particularly in light of your question the way you asked it.

Jazminn then claims that this statement clearly indicates that the circuit court based its decision as to summary judgment on its conclusion that Jazminn's mother's testimony was not credible, and therefore, Dr. Merrick's testimony was not credible because she relied on the testimony of Jazminn's mother. We disagree. In issuing its decision from the bench at the end of the summary judgment hearing, the court started by stating that it was "really very much aware of the fact, extremely aware of the fact that on a motion for summary judgment the Court does not make credibility findings." The circuit court went on to state that it found the evidence in this case did not come close to the kind of circumstantial evidence that is required to proceed to trial. In supporting its decision, the circuit court did not disregard Dr. Merrick's testimony but, in fact, relied on her statements as to what she could and could not determine from the facts before her. The circuit court then stated that it was going to grant the appellees' motion "for the reasons stated in the Motion and the reasons argued here by Defense and, basically, for based upon Dr. Merrick's testimony." From this record, we find no basis for concluding that the circuit court based its ruling on credibility determinations or its own conclusions on medical issues like causation.

For the reasons stated above, we affirm the circuit court's grant of summary judgment in favor of appellees.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.